Allstate Insurance Company (hereinafter Allstate) filed an action for declaratory judgment against the Commissioner of Revenue seeking a determination that it was not a holder of unclaimed funds within the meaning of the Alabama Uniform Disposition of Unclaimed Property Act, Ala. Code 1975, §35-12-20, et seq. By answer, the commissioner asserted that under the provisions of the Act, Allstate was obligated to deliver the sum of $20,649.68 to the State of Alabama. Of this claimed sum, $16,741.19 was based on Allstate's records which reflected drafts in that aggregate amount, *Page 173 
issued by the company from June 1, 1967, to December 3, 1970, which were never endorsed nor presented for payment by the respective payees and were subsequently cancelled by Allstate. The remainder was based on the commissioner's estimate of the volume of unpresented and cancelled drafts for the period from April 27, 1965, through December 31, 1966, for which period no Allstate records were in existence. The parties filed a joint stipulation of facts, and the case was submitted to the trial court upon the stipulation, together with the testimony of one witness.
By its final decree, the trial court held that unpresented drafts issued and subsequently cancelled by Allstate totaling $16,741.19 represented funds subject to the provisions of the Act and, as such, were deliverable to the commissioner. The trial court also held that the company was not to be considered a "holder" within the meaning of the Act of the remaining, estimated sum assessed by the commissioner. The court thus ordered that Allstate deliver to the commissioner the sum of $16,741.19.
The following facts were stipulated:
1. Plaintiff Allstate Insurance Company ("Allstate") is a corporation organized and existing under the laws of the State of Illinois, has its principal place of business in the State of Illinois, and is doing business in the State of Alabama. Allstate is an insurance corporation within the meaning of the Uniform Disposition of Unclaimed Property Act, Code of Alabama (1975) §§ 35-12-(20-48) (the "Act"), § 35-12-21 (5).
2. Defendant Ralph P. Eagerton, Jr., as Commissioner of the Department of Revenue of the State of Alabama (the "Commissioner") is charged with the administration and enforcement of the Act.
3. Allstate offers various lines of insurance, including casualty coverage. It is legally liable under the terms of its casualty insurance contracts to make payments only upon proof of the occurrence of specified events in defined circumstances. Allstate's liability under all of its casualty insurance contracts runs only to its policyholders and other covered individuals as defined in the contract, and thus all payments under such contracts are made directly to or on behalf of such individuals. For example, as a casualty insurer, Allstate is required to pay a first-party claimant (its own insured or such other person as may be provided policy coverage) only if it is established that such claimant in fact has sustained a loss or incurred expenses for which an Allstate insurance policy provides coverage. Similarly, Allstate is required to pay a third-party claimant only if an Allstate policyholder or other covered person has been found liable to such claimant for damages resulting from specified acts or omissions as to which the particular Allstate insurance contract affords coverage. However, Allstate frequently finds it advisable to offer payments in full or partial settlement of any claims prior to the establishment of liability under the terms of its policies.
4. For the period between January 1, 1965 and December 31, 1970, Allstate prepared and issued drafts for the purpose of full or partial claim settlements.[1] Such drafts were payable through a bank in the state of the reporting Allstate regional office. . . . Each provided on its face that it would be "void if not presented within six months after [the] date of issue." In addition, each bore the following endorsement legend:
 Endorsement hereof acknowledges that this payment is offered and received in full satisfaction of the claim shown on the other side; and that upon acceptance and payment of this draft the Allstate Insurance Company is hereby released and discharged of said claim.
Finally, each draft, when prepared, recited that it was in full settlement of all or a *Page 174 
specified portion of the claim to which it was attributable.
5. During all periods relevant to the matters at issue in this action, the following accounting and banking procedures have been applicable to Allstate's preparation of drafts:
(a) When a claim is first reported by a policyholder or claimant, Allstate verifies coverage applicability and, where appropriate, opens a numbered claim file, estimates the amount of its potential liability with respect to the claim, debits an expense account designated "Incurred Claims and Claims Expense (Allocated)" ("ICCE (A)") in the amount of the estimate and credits a liability account designated "Reserve for Losses" in an identical amount. If a draft is prepared for the purpose of partially or fully settling the claim, Allstate debits the "ICCE (A)" account and credits a liability account designated "Drafts Outstanding" in the amount of the draft. At the same time, an entry is made debiting the "Reserve for Losses" account and crediting the "ICCE (A)" account in order to adjust the "Reserve for Losses" account to zero if the draft was issued for the purpose of partially settling the claim.
(b) If a draft is not presented within the six month period after its date of issue, Allstate immediately initiates a procedure to indicate on its own records that the draft should not be honored. (For convenience, this procedure, whether initiated because of the passage of six months after date of issue or for some other reason, is called "cancellation," and drafts as to which the procedure is completed are called "canceled drafts.") . . .
(c) If the draft is delivered to the payee and if the payee accepts the draft by endorsing it and presenting it for collection, the draft proceeds through the banking system to the bank through which the draft is payable. The bank in turn presents the draft to Allstate for payment. Allstate either approves and pays the draft within 24 hours or notifies the bank that the draft will not be honored. Allstate will in no event honor a draft (1) which is presented more than six months after date of issue and canceled on Allstate's records, (2) which is canceled for some other reason, or (3) which is not properly endorsed by the payee.
(d) If a draft is properly endorsed and timely presented by the payee, and otherwise approved for payment by Allstate, the appropriate accounting entry is to debit "Drafts Outstanding" and credit a cash account. If a draft is not presented prior to cancellation or is not properly endorsed, Allstate reverses the entry explained previously regarding the issuance of a draft. When Allstate determines that a claim file should be closed, the "Reserve for Losses" account is debited for the amount, if any, remaining as a reserve and the "ICCE (A)" account is credited. Thus, when a claim is closed, Allstate has no amount recorded in any of its liability accounts with respect to such claim.
6. Pursuant to the provisions of §§ 35-12-31 and 35-12-33 of the Act, Allstate, for the period between January 1, 1965 and December 31, 1970, filed reports with the Commissioner respecting "unclaimed and abandoned" funds, within the meaning of § 35-12-23 of the Act, which it held. Thereafter, Allstate duly delivered such funds to the Commissioner. These funds consisted of checks issued by Allstate to various payees within the State of Alabama, which checks were not negotiated during a seven-year period following their respective dates of issue. . . .
7. In 1978, the Commissioner, through his authorized representatives, conducted an examination of certain records maintained by Allstate at its Birmingham, Alabama District Claims Office. Specifically, the records examined by the Commissioner's representatives consisted of approximately 40,000 claim files, each of which . . . was opened by Allstate in response to a report of a claim by one of its policyholders or by a claimant. . . .
8. Subsequent to the examination of records . . . the Commissioner . . . initially advised Allstate that it was considered to be a holder of additional "unclaimed and *Page 175 
abandoned" funds, within the meaning of § 35-12-23 of the Act, totaling $24,828.91. The Commissioner further advised Allstate that it was required by the provisions of the Act to remit such funds to the State of Alabama.
9. Of the original $24,828.91 in additional funds claimed by the Commissioner to be held and owing by Allstate, $20,371.45 represented certain drafts prepared between January 1, 1967 and December 31, 1970. . . . More than six months had elapsed from the date of issue of each such draft. None of these drafts had been endorsed and presented by the respective payees, and all such drafts have been canceled by Allstate. All claim files in which such canceled drafts were recorded have been closed by Allstate, and no fixed liability has been established with respect to any claim in response to which any such draft was issued. The remaining amount of additional funds claimed by the Commissioner to be held and owing by Allstate ($4,457.46) represented an estimated sum for the period from April 27, 1965 through December 31, 1966, for which no Allstate claim files are in existence. . . .
. . . .
The Commissioner no longer claims funds represented by drafts in the following categories:
(a) Drafts Cashed. . . .
(b) Drafts Replaced by Subsequent Drafts. . . .
(c) Drafts Issued to Non-Residents. . . .
(d) Drafts Issued for Unrendered Services. . . .
(e) Drafts Issued in Error. . . .
. . . .
14. Allstate drafts totaling $16,741. 19, as referred to in the preceding paragraph, fall into the following categories:
(a) Drafts Issued in Payment of Claim-Related Services. A single draft in the amount of $22.50 was reissued by Allstate and not presented for payment. The payee, the Jefferson County Probate Court, returned the second, reissued draft for cancellation, stating, through its senior accountant, that no amount was due and owing from Allstate to the Court.
(b) Drafts Issued in Response to Claims Under InsurancePolicies. Drafts totaling $15,854.73 were issued to Allstate policyholders or to third parties, whose last known address is in the State of Alabama, in response to claims under automobile and homeowners' insurance policies. These drafts were canceled by Allstate due to the failure of the payee(s) to endorse and present them for payment within six months of the date of issue, as is required by the terms stated on the face of the drafts. Of this total, $353.25 represents drafts issued to policyholders as reimbursement of policy deductibles recovered by Allstate through subrogation procedures; $3,570.65 represents drafts issued to third parties for the purpose of settling claims for property damage or personal injury arising out of an occurrence involving an Allstate policyholder; and the remaining $11,930.83 represents drafts issued for the purpose of settling claims by policyholders for medical care or property damage.
(c) Draft Cancellations Noted in Wrong File. Certain of the claim files cited by the Commissioner contain notations of the cancellation of a draft issued from another, unidentified file. The cited files contain no copy of the draft and no notation of the payee's identity, the date of issue of the draft, the reason for issue, or the reason for cancellation. The total of the items falling into this category is $863.96.
The uniform act provides in pertinent part, as it relates to insurance corporations:
 (a) Unclaimed funds, as defined in this section, held and owing by an insurance corporation shall be presumed abandoned if the last known address, according to the records of the corporation, of the person entitled to the funds is within this state. . . .
 (b) "Unclaimed funds," as used in this section, means all moneys held and owing by any insurance corporation unclaimed and unpaid for more than seven years after the moneys became due and payable *Page 176 
as established from the records of the corporation. [Emphasis added.]
Ala. Code 1975, § 35-12-23.
Are the amounts represented by the unpresented drafts "moneys held and owing . . . unclaimed and unpaid" for more than seven years as the statute reads? We think not. It is true, as the commissioner argues, that for a period of six months after they are issued, Allstate is required to pay the drafts if properly endorsed and presented, and it can be argued that by failing to endorse and present the drafts for payment, the payee abandons the funds. However, it is equally true, as Allstate argues, that after the passage of six months, a payee has no claim on the draft, but simply has an unliquidated and unconceded claim on the underlying policy of insurance. Thus, Allstate by virtue of these drafts does not hold "moneys owing" after the passage of six months. If the drafts were issued in payment of fixed amounts due under the insurance contract, such as the face amount of a life insurance policy, the face amounts might well be "unclaimed funds" within the meaning of the act, but that is not the case before us. Here, the company retains the right to reject and litigate all claims not "settled" by accepting and presenting the drafts within six months. This is true even though the drafts are negotiable, a fact which is irrelevant to the issue in this case. Under the stipulated facts, the drafts were issued for the purpose of settling unliquidated claims and do not constitute an acknowledgement by the company that it is liable to the payee in that amount.*
Kane v. Insurance Co. of North America, 38 Pa. Commw. 42,392 A.2d 325 (1978), involved a similar set of facts:
 Turning to that class of property consisting of the proceeds of uncashed checks and drafts issued by INA, the following findings of fact made by Judge Takiff of the court below, Kane v. Insurance Company of North America, No. 771, Dec. Term, 1962, filed January 20, 1976, are material:
 "48. At various times since 1941, the Respondent [INA] issued checks, drafts and credit memoranda to various persons. Neither the persons to whom such checks, drafts and credit memoranda were issued, nor any one in their behalf, has claimed the amounts of such checks, drafts and credit memoranda. . . .
". . .
 "50. No claim for the amounts of such checks, drafts and credit memoranda has been made for more than seven successive years, and the whereabouts of the persons entitled to claim such amounts have been unknown for the said period of time.
 "51. INA issued checks, drafts and credit memoranda at the rate of about one million items per year.
 "52. Except as recited in the following findings, [53-57] the only evidence as to the circumstances surrounding the issuance of these drafts is advice copies sent to the cashier of the company, showing the draft number, issue date, payee and a general notation of purpose, all intended to serve for a test comparison whenever the original is presented.
 "53. The checks, drafts and credit memoranda fall into three categories:
 "a) third party drafts; issued to third parties under a liability policy under which the company agreed to indemnify the insured against any loss by reason of liability imposed by law for damages payable to a third party.
 "b) first party drafts; issued to the insured himself to cover injury to his own health or property under a policy protecting the same.
 "c) drafts for goods and services; issued for goods or services performed or to be performed.
 "54. As a matter of practice, the company might issue these drafts (a) either *Page 177 
as payment of an agreed settlement of a claim under one of its policies, or as an offer of settlement not later accepted by the third party or the policyholder, or (b) as payment for goods or services already received or as an offer to pay for goods or services to be received later.
 "55. With respect to third party drafts, the policy in connection with which a claim draft was issued did not impose any liability upon INA until the policyholder had become legally obligated to pay damages to a third party.
 "56. With regard to first party drafts, in some instances these drafts were issued with respect to policies of insurance providing that no suit might be brought thereon unless started within twelve months of an insured loss.
 "57. As to no item here in litigation and of the types described in findings 52 (a), 52 (b) and 52 (c) has the policyholder in the second case or any third party claimant in the first or third category brought any action under the policy or against the policyholder, respectively."
392 A.2d at 328.
In that case, the court held that the funds did not escheat to the state under the Pennsylvania statute, which is not materially different from our own, and reasoned as follows:
 The fatal flaw in the Commonwealth's case is its failure to prove that those persons to whom the checks, drafts and credit memoranda were payable, or to whose accounts they were credited, were unqualifiedly entitled to same. The findings of the court below that at least some of the items in question were drawn in anticipation of unliquidated claims never made, or liabilities never incurred, leaves the Commonwealth, whose rights in an escheat proceeding are derivative, In the Matter of the Inquisition of Escheat of the Estate of Sarah Desilver, Deceased, 5 Rawle 111 (Pa. 1835); Murdock v. John B. Stetson Co., 32 Pa.D. C.2d 300 (C.C.P. Phila. 1963); State ex rel. Parsons v. Standard Oil Co., 5 N.J. 281, 74 A.2d 565 (1950), in the position of attempting to create unliquidated claims where none exist. See Sennett, supra 432 Pa. 525 at 530, 247 A.2d 774 at 777; Texas Co. v. State ex rel. Coryell, 198 Okla. 565, 180 P.2d 631 (1947). It can claim no more than the interest of the unknown or absentee owner.
392 A.2d at 329.
We think this reasoning applies to this case. The drafts in this case were offered in settlement of unliquidated and unconceded claims. They do not represent moneys due and owing to the payee. Therefore, the amounts thereof do not represent funds abandoned to which the commissioner is entitled under the act.
The judgment of the trial court is reversed, and the cause is remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur.
[1] As used in this Stipulation, the words "for the purpose of settlement," or words of similar import, are not intended to indicate that the drafts were or were not issued pursuant to a separate negotiated settlement agreement whereby Allstate agreed to pay a certain amount and the claimant released Allstate from liability on the claim. [This statement appears in the stipulation.]
* This fact distinguishes this case from Blue Cross of NorthernCalifornia v. Cory, ___ Cal.App.3d ___, 175 Cal.Rptr. 901 [1981]. In that case it is expressly stated: "When Blue Cross mailed a check to . . . [a] . . . subscriber, it was not as an offer to settle an unliquidated claim, but as payment of an unconditional obligation." (Footnote 3, finding number 7.)