This is an appeal by the defendant Aetna Casualty Surety Insurance Company (Aetna) from an adverse judgment rendered against it in an action brought by the State of Alabama to recover funds under the Uniform Disposition of Unclaimed Property Act, Code of 1975, § 35-12-20 et seq. We reverse and remand.
In its original complaint the State sought judgment for the sum of $42,023.00 under §§ 35-12-23 and 35-12-29 of the Act; the State later amended its complaint by adding the allegation that defendant held property pursuant to § 35-12-22.
Section 35-12-22 refers to property "held or owing by a banking or financial organization or by a business association," and specifically to:
 "(3) Any sum payable on checks certified in this state or on written instruments issued in this state on which a banking or financial organization or business association is directly liable, including, by way of illustration but not of limitation, certificates of deposit, drafts, money orders and traveler's checks, that, with the exception of traveler's checks, has been outstanding for more than seven years from the date it was payable, or from the date of its issuance if payable on demand, or in the case of traveler's checks, that has been outstanding for more than 15 years from the date of its issuance, unless the owner has within seven years, or within 15 years in the case of traveler's checks, corresponded in writing with the banking or financial organization or business association concerning it, or otherwise indicated an interest as evidenced by a memorandum on file with the banking or financial organization or business association."
Section 35-12-23 refers to unclaimed funds "held and owing . . . unclaimed and unpaid for more than seven years after the moneys became due and payable."
Section 35-12-29 is a catch-all section referring to "[a]ll tangible and intangible personal property, not otherwise covered . . . including . . . amounts due and payable under the terms of insurance policies not covered by section 35-12-23."
Aetna's answer denied holding any property presumed abandoned under the Act's provisions. Other defenses were also asserted. An ore tenus trial ensued following which the trial court, after making certain findings of fact, entered judgment in the amount of $28,217.08, together with accrued interest in the amount of $7,565.65, or a total of $35,782.73, for the State.
The property in question consisted of a number of drafts issued by Aetna's Alabama field offices during the period April 27, 1965, through December 31, 1969. These drafts were identified by Alabama auditors who reviewed Aetna records which consisted of computer printouts of drafts on which payment had been stopped because these drafts had not been presented for payment within four years following issuance. These records established that 336 drafts had been issued by Alabama offices between 1965 and 1969 but not presented for payment within four years. The trial *Page 457 
court found that drafts had been issued for the following types of claims:
 "AMOUNTS ITEMS -------- ----- "1. 1st Party $13,137.50 70 "2. 3rd Party 18,755.39 79 "3. Auto Medical Payments 211.75 5 "4. Compensation Indemnity 2,954.79 57 "5. Compensation Medical 1,519.61 87 "6. No Policy (P.R. or Ind. Adj.) 92.85 33 "7. Accident Health 117.00 5 ---------- ---- "TOTALS $36,788.89 336"
Under those types, first party claims are those by a policyholder for damage to his property. Third party claims are those of a person contending that a policyholder is liable to him for damage to him. As to these drafts, Aetna's position below and on appeal is that these drafts were not evidence of liquidated claims but were issued as offers to settle claims and that, unless those offers were accepted by the payee's endorsement of the draft, Aetna had no fixed obligation to the claimant. Aetna does not contest the trial court's finding with respect to the five other types. The State of Alabama, on the other hand, contends that the evidence adduced below supports the trial court's findings that the subject drafts were issued to claimants only after such claimants had provided Aetna with any necessary releases, thus that these drafts were unclaimed property subject to the provisions of the Uniform Act.
In its final judgment the trial court made findings with respect to the internal procedures utilized by Aetna in the issuance and payment of drafts:
 "1. During the relevant period and to the present time, Aetna, which is an insurance company, paid the several types of claims made upon it by drafts. These drafts were issued by Aetna's field offices to pay casualty claims, and expenses related thereto, including first party claims, third party liability claims, automobile medical payment claims, compensation indemnity claims, compensation medical claims, accident and health claims and expenses such as police reports and other incidental items of expense. In Alabama, Aetna's field offices consist of its main branch office in Birmingham with a sub-office in Mobile.
 "2. It has been shown that when a field office of Aetna issues a draft, it forwards a copy of the draft called an `advice' to the company headquarters in Hartford, Connecticut. There, the advice is kept on file pending further action or procedures. It has been shown that after a draft is issued and it becomes necessary for a field office to cancel the draft or stop payment on it because of an error in the name of the payee, an erroneous amount, refusal of a payee to accept it in settlement or for miscellaneous other reasons, Aetna's procedure provides that the field office send to the company headquarters a cancellation advice or an advice of stop payment which are matched with the copy of the advice first sent. Once issued, these drafts constitute unconditional, unrestricted obligations which the payee may cash at any bank or, otherwise, by merely endorsing them as any other negotiable instrument. It has further been shown that, according to company procedures, the drafts are honored automatically unless a stop payment has previously been entered into Aetna's computer or the draft exceeds $10,000. In the latter instance, the draft is forwarded to the Claim Department of the Company for approval prior to payment. Except as stated, it appears that in all instances, the drafts are treated by Aetna as checks drawn upon an Aetna bank account.
 "3. Aetna maintains permanent computerized records concerning all advices of drafts which have been issued by its field offices but were never presented for payment. Among the information encoded into Aetna's computer is the `claim key' appearing on each draft and each advice of draft. The claim key indicates the state to which the draft was sent by Aetna's home office in the form of batch or bulk drafts that are forwarded in blank. The code number assigned to the *Page 458 
Birmingham branch office and its sub-office is 76. In conducting their audit, the Alabama auditors, in reviewing the computer printouts provided by Aetna relating to unpresented drafts, extracted the unpresented drafts bearing the 76 claim key. These unpresented advices of drafts bearing the Alabama claim key number were transcribed and introduced into evidence in this action as Plaintiff's Exhibit 5. It has not been disputed that this exhibit is an accurate transcription of Aetna's unpresented drafts bearing the 76 claim key.
 "It has further been shown to the satisfaction of the Court the unpresented drafts bearing the 76 claim key were issued by agents of Aetna's offices in Alabama to persons in the State with the following exception. Aetna's sub-office in Mobile also handled claims in the Panhandle area of the State of Florida. The evidence shows that these claims constituted 23.3% of the claims paid by Alabama claim agents. It therefore appears that the drafts written for and delivered to Florida claimants were not issued in Alabama. The Court also concludes that the remainder of the drafts revealed by audit were issued in this State."
The court then added:
 "In each instance of the drafts involved here, they bear the writing `in satisfaction of _____.' Testimony provided by employees of Aetna lacks definiteness and is in conflict in the matter of releases. Mr. John T. Bailey, who is an administrator in the claims procedure area of the Aetna Casualty Company testified that if a release or proof of loss was required by Company policy or procedure, such release or proof of loss was obtained by the Company prior to the issuance and delivery of a draft. He further testified that on all claims a payee had signed a release if it was necessary at the time the draft was signed and delivered, stating that if such had not been done the claimant could cash the draft and ask for a further payment if no release had been executed. Mr. Cecil Brown, an Aetna claims representative since 1966 in the Alabama area, testified that no releases were required in the instances of First Party claims but were required prior to approximately 1967 for Third Party claims. After such date, Mr. Brown testified that releases were discretionary in the instances of Third Party claims.
 "The Court finds that the substance of this evidence is that if releases were desired or required by Aetna, such releases were obtained from the payee of a draft prior to the delivery of such draft."
It should be noted that under Aetna's procedures a draft not presented for payment within four years following issuance was the subject of a stop payment order and thus was not automatically paid, but was the subject of review to determine whether payment should ensue.
The crucial question before us is whether there is evidence supporting the legal conclusion that these unpresented and unpaid drafts represented "moneys held and owing more than seven years after the moneys became due and payable."
Though not precisely on all fours with the facts of this case, the case of Allstate Insurance Company v. Eagerton, Ala.,403 So.2d 172 (1981), furnishes clear guidance. In that case the insurance company similarly settled first and third party claims by drafts. Allstate's drafts provided on their faces that they were "void if not presented within six months after date of issue." Additionally, each bore an endorsement legend as follows:
 "Endorsement hereof acknowledges that this payment is offered and received in full satisfaction of the claim shown on the other side; and that upon acceptance and payment of this draft the Allstate Insurance Company is hereby released and discharged of said claim."
Each also recited that it was in full settlement of all or a specified portion of the applicable claim.
After describing the internal accounting procedures which led to the issuance of drafts in partial or full settlement of claims, and which were never presented for *Page 459 
payment, this Court explained, at 403 So.2d 176:
 "Are the amounts represented by the unpresented drafts `moneys held and owing . . . unclaimed and unpaid' for more than seven years as the statute reads? We think not. It is true, as the commissioner argues, that for a period of six months after they are issued, Allstate is required to pay the drafts if properly endorsed and presented, and it can be argued that by failing to endorse and present the drafts for payment, the payee abandons the funds. However, it is equally true, as Allstate argues, that after the passage of six months, a payee has no claim on the draft, but simply has an unliquidated and unconceded claim on the underlying policy of insurance. Thus, Allstate by virtue of these drafts does not hold `moneys owing' after the passage of six months. If the drafts were issued in payment of fixed amounts due under the insurance contract, such as the face amount of a life insurance policy, the face amounts might well be `unclaimed funds' within the meaning of the act, but that is not the case before us. Here, the company retains the right to reject and litigate all claims not `settled' by accepting and presenting the drafts within six months. This is true even though the drafts are negotiable, a fact which is irrelevant to the issue in this case. Under the stipulated facts, the drafts were issued for the purpose of settling unliquidated claims and do not constitute an acknowledgement by the company that it is liable to the payee in that amount."
It is significant that this Court's opinion in Allstate citedKane v. Insurance Company of North America, 38 Pa. Commw. 42,392 A.2d 325 (1978), as persuasive authority. In Kane the insurance company was shown to have issued, inter alia, first party and third party drafts as Aetna had done here. The evidence of their issue was shown to be advice copies sent to the company cashier to serve as comparisons or presentment of the original, also as Aetna had done here. That court found:
 "`. . . As a matter of practice, the company might issue these [third party] drafts . . . either as payment of an agreed settlement of a claim under one of its policies, or as an offer of settlement not later accepted by the third party or the policyholder, or [first party drafts] . . . as payment for goods or services already received or as an offer to pay for goods or services to be received later.'"
In this case it was proved that Aetna was required to pay a third party claim only if Aetna's policyholder had been found liable to the claimant for damages for an act or an omission of its insured covered by the policy. As to first party claims, Aetna was required to pay only when the claimant had established that he had sustained loss or expenses covered by an Aetna policy and the amount of loss sustained. And during the period in question drafts were issued by Aetna routinely in efforts to settle claims before any obligation to do so had been established.
We note also that, although Aetna's draft did not on its face provide a voiding clause if not presented within six months, nevertheless Aetna did stop payment when the draft was not presented for payment within four years. According to the evidence, when such a stop payment entry was made, the draft was not thereafter paid but was subject to an internal review to determine whether payment should be made. At that point no accounting entry would be made because none were made when the drafts were issued.
It is apparent that the court below placed stress upon the negotiability of the drafts in question and upon its finding that "the substance" of the evidence was that "if releases were desired or required by Aetna, such releases were obtained from the payee of a draft prior to delivery of such draft." As to the negotiability of the drafts, that fact is irrelevant here, as it was in Allstate, supra, at 176. Their negotiability was neither an acceptance nor a presentment for payment and, moreover, had no effect upon Aetna's later determination to stop payment. The finding concerning possible releases *Page 460 
is not a finding that these drafts were evidence of any underlying obligation, such as the kind we called attention to in Allstate, supra, at 176, when we stated:
 "If the drafts were issued in payment of fixed amounts due under the insurance contract, such as the face amount of a life insurance policy, the face amounts might well be `unclaimed funds' within the meaning of the act, but that is not the case before us. . . ."
The speculation that releases, if required, were obtained, fails to establish that, in fact, releases were obtained in each instance which converted an unliquidated claim to a liquidated one. And although containing different conditional language than the drafts described in Allstate, Aetna's drafts did on their faces announce that they were issued "in satisfaction of [the claim]." Such language does not necessarily import a liquidated obligation.
Finally, it cannot be reasonably argued that these drafts represented "moneys held and owing . . . unclaimed and unpaid" for more than seven years when the company stopped payment on them after four years and subjected each to an internal review. Such a determination itself removed any previous opportunity to settle each claim by accepting the draft and presenting it for payment.
We have concluded, therefore, that the trial court's application of the facts adduced below to the requirements of the statute as explained by our decision in Allstate, supra, was erroneous. The ore tenus rule in such an instance is inapplicable. Home Indemnity Company v. Reed Equipment Company,Inc., Ala., 381 So.2d 45 (1980). Accordingly, the judgment is reversed and the cause is remanded for an order not inconsistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.