The MASON AND DIXON LINES, INCORPORATED, Plaintiff,

v.

Ralph P. EAGERTON, Jr., as Commissioner of the Alabama State Department of Revenue, Defendant.

Civ. A. No. 81–148–N.

United States District Court, M.D. Alabama, N.D.

Aug. 27, 1982.
On the Merits Dec. 15, 1982.

Capell, Howard, Knabe & Cobbs, L. Lister Hill and Shapard D. Ashley, Montgomery, Ala., for plaintiff.

Charles A. Graddick, Atty. Gen. of Ala., Herbert I. Burson, Jr., Chief Counsel, Dept. of Revenue, John H. Burgess,* Asst. Counsel, Dept. of Revenue, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiff bases jurisdiction in this Court on the grant of general federal question jurisdiction, 28 U.S.C. § 1331, and federal commerce clause jurisdiction, 28 U.S.C. § 1337. On February 12, 1982, the Court, *sua sponte,* raised the issue of whether it has subject matter jurisdiction over this cause. Specifically, the Court was concerned that the requirement that a federal question appear on the face of a "well-pleaded complaint" had not been met in the context of this declaratory judgment action. Briefs were filed by March 22, 1982 and a hearing was held April 1, 1982.

The defendant, Commissioner Ralph P. Eagerton, Jr., is charged with the responsibility of carrying out the provisions of Alabama's Uniform Disposition of Unclaimed

---

* Mr. Burgess apparently resigned and the case was handled by William E. Bundrant, but Bundrant never appeared as counsel of record in the case.

Property Act, Ala.Code § 35–12–20 *et seq.* (1975). Briefly, the Act provides for the State to collect property and funds due to Alabama citizens and presumed abandoned, attempt to find the owners of the property, and process claims for such property. One of the Act's requirements is that businesses or other organizations file a report each year identifying abandoned property and providing specified information about the Alabama claimant. Ala.Code § 35–12–31 (1975). After reporting, the holder has a specified period of time in which to pay or deliver the abandoned property to the State. § 35–12–33.

In order to enforce the Act, the Commissioner has the authority to review the records of a purported holder, § 35–12–43, and to file suit in the appropriate court to enforce delivery of the property. § 35–12–44. Moreover, any person who wilfully fails to file a report may be fined and one who wilfully refuses to pay or deliver property may be punished by a fine and/or imprisonment for up to six months. § 35–12–45.

Plaintiff, Mason and Dixon Lines, Incorporated, is a motor common carrier licensed by the Interstate Commerce Commission and operating in eighteen states, including Alabama. On approximately February 5, 1980, and several times thereafter, the Alabama Department of Revenue conducted an audit of plaintiff's records at its office in Kingsport, Tennessee to determine if plaintiff held any money subject to the Act. In July, 1980, the Commissioner notified plaintiff that the Department had determined that plaintiff held funds in the amount of $93,464.48 which were subject to the Alabama Uniform Disposition of Unclaimed Property Act. Defendant also submitted a copy of its report to plaintiff, requesting that plaintiff remit full payment of the amount stated to the Department of Revenue. The Commissioner subsequently informed plaintiff that failure to comply would result in the State's instigating a civil enforcement action against plaintiff.

On March 11, 1981, plaintiff filed in this Court for declaratory and injunctive relief claiming that the application of the Alabama Uniform Disposition of Unclaimed Property Act to plaintiff was unconstitutional. Plaintiff specifically charged that the Act constitutes an undue burden on interstate commerce, is preempted by federal law, and conflicts with and impedes the administration of ICC rules and regulations. A threshold issue is whether this complaint properly raises a federal question sufficient to establish jurisdiction under Sections 1331 and 1337 of Title 28, United States Code.

■ It has long been established that the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, is a remedial, not a jurisdictional, statute. An action for declaratory relief must meet the requirements of one of the statutes conferring jurisdiction on the federal district courts. Section 1331 grants jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Section 1337 provides for jurisdiction over "any civil action or proceeding arising under any Act of Congress regulating commerce. . . ." In construing these statutes, the Court must determine whether plaintiff's claim for relief "arises under" federal law.

In the landmark case of *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–74, 70 S.Ct. 876, 878–80, 94 L.Ed. 1194 (1949), the Supreme Court held that in order for a case to "arise under" federal law the plaintiff in a declaratory action must in his complaint be asserting a federal right and not anticipating a federal defense. In distinguishing between the jurisdictional requirements for invoking the new remedy of a declaratory judgment and the purpose of the new form of relief, the Court noted that:

> "[p]rior to [the] Act a federal court would entertain a suit . . . only if the plaintiff asked for an immediately enforceable remedy like money damages or an injunction, but such relief could only be given if the requisites of jurisdiction, in the sense of a federal right or diversity, provided foundation for resort to the federal courts. The Declaratory Judgment Act allowed relief to be given by way of recognizing the plaintiff's right even

though no immediate enforcement of it was asked." 339 U.S. 671–72, 70 S.Ct. at 879.

In *Skelly*, Phillips had sought to bring an action to enforce a contract, a state law claim, in federal court by pleading that the issue of enforcement depended upon a construction of federal law. In reality the federal issue would only arise when and if the defendants, Skelly Oil Co. and others, raised the state law defense of lack of fulfillment of a condition of the contract—issuance of a Federal Power Commission certificate. Since the federal issue would only arise as an answer to a defense, Phillips was raising a federal issue "in anticipation of avoidance of defenses" and his "well-pled" complaint did not state a federal claim. *Louisville & Nashville Ry. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908).

Similarly to *Skelly*, the defendants in the oft cited opinion of Justice Cardozo in *Gully v. First National Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), sought to remove a suit brought by a state tax collector against a national bank, based on the assertion that the authority and scope of the state tax statute was dependent on the provisions of federal law. The Court held that although the statute must be consistent with federal statutory and constitutional law, the state's claim was based on a contract and a taxing statute both of which had their origins in state law. In discussing the concept of "arising under", Justice Cardozo noted that several tests had been established.

"To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.... The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.... A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto...." 299 U.S. at 112–113, 57 S.Ct. at 97–98.

Finally, Justice Cardozo emphasized that the nature, not just the origin of the right, must be federal and the real substance of the controversy; there must be more than just "a question of federal law ... lurking in the background." 299 U.S. at 117, 57 S.Ct. at 100.

The language in *Skelly* disallowing jurisdiction over a complaint which pleads a federal issue in "avoidance of a defense" has raised questions about federal court jurisdiction in those cases where the nominal declaratory plaintiff is in reality in the position of a defendant in a state court enforcement action. The issue has been further clouded by dicta in the opinion of the Supreme Court in the case of *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). In that case the Court held that Wycoff's suit for a declaration that its transportation of certain goods in intrastate commerce could not be regulated by the state was not ripe because the state had neither attempted nor threatened to regulate the transportation. However, in concluding their discussion, the Justices expressed concern that

"where the complaint ... for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, *there may not be an injury sufficient* to support a federal claim and the courts should be hesitant to grant jurisdiction and let the party begin his federal defense before the state court begins the case under state law." (emphasis added) 344 U.S. at 248, 73 S.Ct. at 242.

This rationale of the Supreme Court has been followed in several circuit court cases denying jurisdiction in a declaratory judgment action. *Madsen v. Prudential Fed. S & L Asso.*, 635 F.2d 797 (10th Cir.1980) *cert. den.*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *Nuclear Eng. Co. v. Scott*, 660 F.2d 241 (7th Cir.) *cert. den.* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1981); *Home Federal S. & L. Ass'n v. Ins. Dept. of Iowa*, 571 F.2d 423 (8th Cir.1978); *Contra, Conference of Federal Sav. & Loan*

*Assn's v. Stein,* 604 F.2d 1256 (9th Cir.1979) *aff'd without opinion,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980).

Mason and Dixon also points to the Fifth Circuit discussion of *Wycoff* in *Braniff International, Inc. et al. v. Florida Public Serv. Com'n,* 576 F.2d 1100 (5th Cir.1978), where the plaintiffs, a group of interstate airlines, sought declaratory and injunctive relief on the grounds that defendants' attempt to regulate the airlines' intrastate routes, fares, and schedules violated the Supremacy Clause, the Commerce Clause, and the Fourteenth Amendment guarantees of due process and equal protection. The Fifth Circuit pointed out that, unlike *Wycoff,* the Florida Public Service Commission had already set in motion the regulatory process in which the Commission could assess a fine or order the airline to cease and desist. The court held that "the mere fact that the constitutional claims might be raised before a state administrative body charged with enforcement of the statute does not alone deprive the court of jurisdiction." 576 F.2d at 1106.

Plaintiff also argues that the Supreme Court has consistently exercised jurisdiction over claims based on Commerce Clause violations and preemption, citing *Hunt v. Washington State Apple Advertisers Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Fla. Lime and Avocado Growers Ass'n v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); and *South Carolina State Highway Dept. v. Barnwell Bros.,* 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). The Court points out that in *Hunt* the Commission and its members clearly had or would suffer an injury prior to any state court action as the apple growers were faced with complying with the North Carolina labeling law and repackaging all their apples or losing their North Carolina clients. 432 U.S. at 333, 97 S.Ct. at 2434. Similarly, in *Bibb* the trucking companies were faced with changing the mud guards on all trucks at the state line or rerouting the trucks around the state of Illinois. 359 U.S. at 523, 79 S.Ct. at 964.

*Barnwell Brothers* presented the same form of injury, and whether or not there was a justiciable controversy was an issue in the *Florida Lime and Avocado Growers* case. See *Florida Lime and Avocado Growers, Inc. v. Jacobsen,* 362 U.S. 73, 85–86, 80 S.Ct. 568, 575–76, 4 L.Ed.2d 568 (1960) [First appeal—Court held justiciable controversy because complaint alleged shipments of avocados had been condemned, requiring reshipment of avocados to other states or loss of the shipment.]

Of course, the Supreme Court in certain cases has recognized that threatened state court action can be a sufficient basis for a "ripe" justiciable controversy in the federal courts. This area of threatened injury is limited to cases where one's First Amendment rights are "chilled" because of the existence of the law or where the state enforcement action would be a criminal rather than a civil proceeding. An example of this reasoning is contained in *Lake Carriers Association v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1971), apparently the only subsequent Supreme Court decision in which the dicta of *Wycoff* was discussed. In a footnote, the Court states that the district court's reliance on *Wycoff* in dismissing the *Lake Carriers* case for lack of a justiciable controversy was misplaced; and, that unlike the situation in *Wycoff,* there was clearly a "present and concrete" controversy between the parties. 406 U.S. at 508 n. 12, 92 S.Ct. at 1756 n. 12.

*Lake Carriers* involved a dispute between a group of owners of federally licensed Great Lakes cargo vessels and officials of the State of Michigan over the application of a Michigan law forbidding sewage discharge from ships into the navigable waters of Michigan. Plaintiffs claimed that the statute unduly burdened interstate commerce, was beyond the state's police power, denied them due process and equal protection, and was preempted by federal law. 406 U.S. at 502, 92 S.Ct. at 1753. Although Michigan was not enforcing the law, it was trying to coerce current compliance with the provisions for storage and holding tanks by threatening to bring criminal misde-

meanor actions against the plaintiffs in the future. 406 U.S. at 502, 508, 92 S.Ct. at 1756. *See Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 253 (7th Cir.1981) (discussion of *Lake Carriers*).

■ This case seems to fall squarely within the Supreme Court's decision on jurisdiction and ripeness in the *Lake Carriers* case. By refusing to file annual reports and to turn over the claimed funds, the plaintiff and its officials run the risk of fines and possible imprisonment if a state court enforcement action is brought. Ala. Code § 35–12–45. This statutory context presents a more serious threat of injury than the situation discussed above where one, realistically in the position of a defendant in a civil case, beats the plaintiff to the courthouse by filing first in federal court in order to have the validity of his federal defense declared. Without a declaratory action in this cause, Mason and Dixon is faced with the choice of complying with the Act or risking criminal sanctions for asserting its federal rights. Plaintiff has not asserted that its compliance is being coerced by threat of criminal suit and defendant, in his brief, has only asserted the possibility of his instituting a civil action to recover the funds; however, the Court cannot ignore the Act's provisions for criminal penalties. *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). There exists a real controversy between the parties in which the plaintiff faces clear injury due to an abrogation of its federal rights. For these reasons the Court concludes that it does have subject matter jurisdiction over this cause.

An order will be entered in accordance with this opinion.

## ORDER

On January 21, 1982, plaintiff filed an answer to defendant's counterclaim and a motion for judgment on the pleadings. Consideration of the motion was stayed until after this Court resolved the jurisdictional issue. The request for partial summary judgment as to the non-payroll claims for money is based on a limitation period in the ICC Act governing motor carriers. 49 U.S.C. § 304a. The Act provides that actions to recover overcharges must be started within three years after the time the cause of action accrues. § 304a(2). The predecessor to this provision, applicable to railroads, has been interpreted to mean that the cause of action is extinguished and not just barred at the end of the three-year period and the time limit may not be altered by private agreements between the parties. *Midstate Horticultural Co. v. Penn. Ry. Co.,* 320 U.S. 356, 364, 64 S.Ct. 128, 132, 88 L.Ed. 96 (1943). ("The purport of the decisions is that Congress intended, when the period has run, to put an end to the substantive claim and the corresponding liability. The cause of action, the very foundation for relief is extinguished.") Since it is clear that a claim for overcharges is extinguished by operation of a federal statute four years before the end of the seven year state statutory abandonment period, both the Supremacy Clause, United States Constitution Art. VI, and decisions under the Alabama Unclaimed Property law dictate that "overcharges" are not subject to the report and delivery provisions of the Alabama Uniform Disposition of Unclaimed Property Act, Code of Alabama §§ 35–12–20 et seq. (1975). *See, Aetna Casualty & Surety Insurance Co. v. State of Alabama Ex. rel Ralph P. Eagerton, Jr.,* 414 So.2d 455 (Ala.1982); *Allstate Insurance Co. v. Eagerton,* 403 So.2d 172 (Ala.1981).

The statute defines "overcharges" as "charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Commission." 49 U.S.C. § 304a(5). The question before the Court is whether all forms of overpayments or retained payments constitute "overcharges" under the statute. Specifically, this Court must determine if claims for duplicate payments due to double billing or double payment of a single bill, unapplied credits resulting from payments that cannot be matched to an account receivable, and interline credits which are

amounts due by plaintiff to other carriers as a result of multicarrier transactions, are "overcharges." The Court has examined the limited case law it has found on this point and concludes that it fails to give a definitive answer to the treatment to be given duplicate payments, unapplied credits, and interline credits. *See, e.g., Chicago, M., St. P. & P.R. Co. v. Alouette Peat Products*, 253 F.2d 449, 456 (9th Cir.1957) (parallel provision for railroads—"there is a distinct difference in the Act between a claim for damages and a claim for overcharges."); *Burlington Northern, Inc. v. United States*, 462 F.2d 526, 528 (Ct.Cl.1972) ("As is apparent from the term, an overcharge occurs only when a carrier submits a bill for services that is in excess of the amount properly due to the carrier."). Plaintiff cited the Court to an ICC decision which held that duplicate payments are overcharges. *Revlon, Inc. v. The Baltimore & Ohio Ry. Co. et al,* ICC Docket No. 35319 (Feb. 16, 1971), while defendant cites the Court to ICC regulations which arguably indicate that the statutory definition of overcharges does not include duplicate payments, overcollections, or unidentified payments. 49 C.F.R. § 1008.2(b) (1981).

For a variety of reasons, the Court is of the opinion that it would be inappropriate to resolve this question by summary judgment on the record before the Court. The Court does not have the audit or supporting documents so it cannot determine the source or the categories of the monies claimed by the State, both of which are factual questions disputed by the parties. Moreover, the Court thinks that the effect of the Alabama unclaimed property law on interstate motor carriers would be better

addressed in the full context of plaintiff's preemption and burden on interstate commerce claims rather than in the context of a single statutory provision. Accordingly, it is

ORDERED that plaintiff's motion for partial summary judgment be and hereby is denied.

### On The Merits

This cause arises out of an unclaimed property report, compiled by defendant and submitted to plaintiff, claiming $93,464.38,[1] which sum was collected by plaintiff from Alabama residents, and which sum is allegedly subject to Alabama's Uniform Disposition of Unclaimed Property Act (UDUPA). *Ala.Code* §§ 35–12–20 *et seq.* (1975). Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, contending that it holds no property subject to Alabama's UDUPA. Defendant has counterclaimed and asserts that the property is subject to the Act. Jurisdiction of this Court exists pursuant to general federal question jurisdiction, 28 U.S.C. § 1331, and federal commerce clause jurisdiction, 28 U.S.C. § 1337.[2] The nonjury trial of this case was held on October 19, 1982. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court now enters its findings of fact and conclusions of law.

### I. BACKGROUND FACTS

Defendant, Commissioner Ralph P. Eagerton, Jr., is charged with the responsibility of carrying out the provisions of Alabama's UDUPA. The Act allows the State to collect property and funds due to Ala-

---

1. Defendant claimed $93,464.38 in his original report sent to plaintiff. Since that time the parties have settled the "unclaimed payroll account checks" issue, shown on plaintiff's Ex. 9 in the amount of $1,203.50 and have stipulated to a mathematical error in that same exhibit resulting in a further reduction of $3,087.14. The result of the settlement and stipulation is that the State of Alabama ex rel. Ralph P. Eagerton, Jr. claims only the sum of $89,173.84 under plaintiff's Ex. 9.

2. On August 27, 1982, this Court decided the issue it raised *sua sponte;* i.e., whether it has subject matter jurisdiction over this cause under the requirement that a federal question appear on the face of a "well-pleaded complaint." Because plaintiff is subject to possible fines and imprisonment by refusing to comply with defendant's demand, § 35–12–45, Alabama Code, and, therefore, because a real controversy exists between the parties in which plaintiff clearly faces possible injury, this Court found it has subject matter jurisdiction of this cause.

bama citizens when the funds are presumed abandoned. The State is required to attempt to find the owners of the property, and process claims for such property. Another of the Act's requirements is that businesses or other organizations file a report each year identifying abandoned property and providing specified information about the Alabama claimant. *Ala.Code* § 35–12–31 (1975). After reporting, the holder has a specified period of time in which to pay or deliver the abandoned property to the State. *Id.* § 35–12–33. In order to enforce the Act, the Commissioner has the authority to review the records of a purported holder, *id.* § 35–12–43, and to file suit in the appropriate court to enforce delivery of the property. *Id.* § 35–12–44.

Plaintiff is a motor common carrier licensed by the Interstate Commerce Commission and operating in eighteen states, including Alabama. On or about February 5, 1980, and twice thereafter, the Alabama Department of Revenue, under its UDUPA authority to review records, conducted an audit of plaintiff's records at its office in Kingsport, Tennessee to determine if plaintiff held any money subject to Alabama law. The result of that audit was a report (Pltf's Ex. 9) compiled by defendant and sent to plaintiff claiming that plaintiff owed the State of Alabama certain money collected by plaintiff from Alabama residents and considered unclaimed property under the UDUPA.

A substantial portion of the testimony at trial concerned the details of the audit performed by department examiners, and an analysis of the nature of the items upon which defendant's claim is based. More specifically, this controversy revolves around the issue of whether two items, denominated as "customer credits" and "interline credits," are owed to someone, and if so, whether they are owed to Alabama residents.

### A. Customer Credits

The Alabama Department of Revenue examiners who performed the Mason and Dixon audit in 1980 conceded that the sole basis for concluding that the list of items denominated as "customer credits" is money owing to someone is the designation as a "credit" on the plaintiff's accounts receivable. Also, the sole basis for defendant's concluding that this money is owed to Alabama residents is a two-digit prefix on each freight bill number, which to the examiners indicates that the point of origin of the shipment is an Alabama terminal. *See* Pltf's Ex. 9, pp. 13, 45.

Other witnesses' testimony, however, indicates to the Court that such evaluation by the examiners is not correct. The testimony of Thomas Fugee (executive director for the National Accounting Finance Council), Clinton Packard (vice president of administration, corporate director and secretary of Georgia Highway Express, an interstate motor common carrier), and William Bundrandt (vice president of accounting at Mason and Dixon), suggests that a motor common carrier's accounts receivable is "a different animal" from a normal business' accounts receivable, that the "credit" designation does not necessarily mean that money is owed to someone, and finally, that the two-digit code prefacing the freight number does not indicate in which state a payment, if any, is owed.

Fugee testified that it is common for a payment to be received by Mason and Dixon from a customer which it cannot match to an account receivable. These unmatched or unidentified payments are reflected as "credit" but this designation, according to this witness, does not mean money is owed a customer—only that the payment cannot be matched to the particular service Mason and Dixon performed.

Bundrandt testified that Mason and Dixon handled over five thousand freight bills a day for the years in question. Mr. Bundrandt gave an explanation of Mason and Dixon's accounting procedure in an effort to show that "customer credits" are not duplicative payments. He testified that a "customer credit" arises when Mason and Dixon sends a bill to its customer for each shipment and encloses a copy of the freight bill. The customer should either return the

copy along with the payment or designate what freight bill he is paying. Once received the freight bill number is keyed into the computer, which debits the corresponding accounts receivable. Sometimes the freight number supplied by the customer will not match any number on the accounts receivable list. At this point Mason and Dixon searches the customer's file to determine if an open receipt exists for another freight bill number. This search is to determine if the customer sent the wrong freight bill number. If no open receipt is found, the information is fed into the computer to search the open receivables and the item is designated as unmatched. If there is any suspicion that the payment is a duplicate— the customer has already paid for that freight bill and is mistakenly attempting to pay it again—a letter is sent requesting the customer to check his records and inform Mason and Dixon whether the payment was a duplicate or whether Mason and Dixon should apply that payment to some other freight bill.

The items defendant is claiming are designated "customer credits" when all such efforts to identify the nature of the payment have been unsuccessful. Although Mr. Bundrandt testified that some of the items remaining on the list could be duplicate payments, the Court agrees with plaintiff's contention that more likely than not the items under the heading "customer credits" are not duplicate payments. The procedure Mason and Dixon employs to match the thousands of daily freight bills, although not perfect, appears to this Court to eliminate insofar as practically possible the likelihood of duplicate payments.

Bundrandt also testified that the two-digit prefix to the freight number, although indicating an Alabama terminal, does not mean someone was billed in Alabama. It means that it was an Alabama terminal which sent the bill out to the customer; the customer could be located in any other city or state.

B. *Interline Credits*

An interline shipment is one that moves over more than one line from pick-up to delivery. In other words, often more than one common carrier is involved in a shipment. To avoid unnecessary confusion only one carrier bills the shipper. When this bill is sent to the shipper, and usually before payment is received from the shipper or a bill received from an interline carrier, the charging carrier enters a debit in the accounts receivable and makes two credit entries. One credit entry will be made for revenue, which represents the charging carrier's share for services performed. The second credit entry is called an interline payable and represents the charging carrier's anticipated liability to the other carriers. This second entry is not a determination of fixed liability but only a prediction of what the charging carrier may have to pay the carriers which may be involved in the shipment. Once these interline credit entries remain on the books for a year they are deleted. All other entries are deleted during the year when a bill from an interline carrier is received.

Mr. Packard testified that it is entirely possible to have an interline credit entered and deleted a year later, yet never owe money to another carrier. The anticipated liability in the form of an interline credit becomes fixed only upon a submission of a bill from another carrier based on that carrier's interline receivable. If Mason and Dixon's books reflect a sum of money is owed under an interline credit, that does not indicate that sum is owed to an interline carrier. In the interstate motor carrier business, whether a charging carrier in fact owes an interline carrier money, and the amount, would be determined from the interline receivable of the interline carrier.

The variance between Mason and Dixon's anticipated liability and that actually incurred and paid is what defendant claims is money owed to Alabama residents. The testimony at trial was inconclusive as to the possible causes of this variance. It is possible that the existence of an interline credit after a year may represent the failure of an interline carrier to submit a bill for its services to Mason and Dixon which would

have been paid. This credit thus would appear to be money owed to the interline carrier, no matter how insignificant the industry deems this possibility to be. It is also possible that the variance represents the difference between what Mason and Dixon estimated the total cost of the shipment to be, and, assuming every interline carrier submitted a bill, what all the interline carriers actually billed Mason and Dixon. Since Mason and Dixon bills the shipper based on the estimate, when the estimate is high the shipper has paid an·inflated price and is owed money from Mason and Dixon. The third possibility is that the interline credit was entered in error and Mason and Dixon owes money to no one.

The Court's prior conclusions as to the meaning of the two-digit prefix to the freight bill number for customer credits applies with equal force for interline credits. The numbers reflect only that the Alabama terminal was the first Mason and Dixon terminal to handle the shipment. They do not reflect the location of an interline carrier or a shipper who may be owed money under an interline credit.

## II. CONTENTIONS OF THE PARTIES

Plaintiff contends that defendant is not entitled to recover any of the claimed sums. Plaintiff alleges that none of the items contained in its Ex. 9, the report compiled by defendant's auditors and submitted to plaintiff, constitutes property unqualifiedly owing in a liquidated amount under Alabama's UDUPA. Furthermore, plaintiff asserts that even if the items in question were to be denominated as unclaimed property, they cannot be subject to Alabama's UDUPA since they are not held or owing to Alabama residents, which is required by the Act. Plaintiff also contends that defendant's attempted application of UDUPA under the facts here violates the Supremacy Clause of the United States Constitution in three particulars: 1) it unduly interferes with interstate commerce; 2) it frustrates and impedes the jurisdiction and express policies and procedures of the Interstate Commerce Commission; and 3) it conflicts

with 49 U.S.C. § 11706(b) (Revised Interstate Commerce Act), which requires that a person bring his civil action to recover overcharges within three years after the claim accrues.

The Commissioner of Revenue contends that the items claimed by the State of Alabama are unclaimed property owing to Alabama residents within the meaning of the Act. He argues that the money shown on Mason and Dixon's books as credits, or at least a substantial portion thereof, originate from duplicate payments and unapplied payments on shipments originating from Alabama. Defendant finally contends that there is no preemption problem presented when he asserts a claim under UDUPA to an interstate motor carrier such as Mason and Dixon.

## III. CONCLUSIONS OF LAW

Before the Court can consider whether the items claimed by defendant fall within Alabama's UDUPA, it must address plaintiff's contention that the Act is preempted by the Revised Interstate Commerce Act's three-year statute of limitations.

### A. *Preemption*

The ICC Act that governed motor carriers at the time of the audit, 49 U.S.C. § 304a, provided that actions to recover "overcharges" must be started within three years after the time the cause of action accrues. *Id.* § 304a(2). That section was repealed in 1978 and replaced by 49 U.S.C. §§ 11705 and 11706. Section 11705(b)(1) provides that a common carrier "is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff...." Section 11706(b) requires such a person to "begin a civil action to recover overcharges under section 11705(b)(1) of this title within three years after the claim accrues." Alabama's UDUPA presumes property abandoned under its provisions only after seven years. *See, e.g., Ala.Code* § 3–12–29 (1975). Since it is clear that a claim for overcharges is extinguished by operation of a federal statute four years before the end of the seven-

**444**

year state statutory abandonment period, the Supremacy Clause, United States Constitution, Art. VI, dictates that "overcharges" are not subject to the report and delivery provisions of the Alabama Act. Defendant concedes in his post-trial brief, filed October 25, 1982, that the seven-year and three-year periods are conflicting and that therefore Alabama cannot make any claims for "overcharges." Defendant contends, however, that "overcharges" are clearly defined by statute, 49 U.S.C. § 304a(5), and that the items he is claiming under the UDUPA are not "overcharges" as set out in the statute. Plaintiff, on the other hand, alleges that interline credits and duplicate payments in the form of customer credits are "overcharges" and therefore are subject to the three-year statute of limitations which preempts Alabama's seven-year provision.

The repealed statute defined "overcharges" as "charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Commission." 49 U.S.C. § 304a(5). The new law defines them as "amounts charged that exceed the applicable rate for transportation or service." *Id.* § 11705(b)(1). The question before the Court is whether duplicate payments in the form of customer credits or interline credits constitute "overcharges" under the statute.

### 1. *Interline Credits*

■ The items designated as interline credits, as discussed earlier, may be derived from several sources. If they are derived from a failure to properly account to the other carriers in interline shipments or from a Mason and Dixon error, they would not be duplicate payments or overcharges and thus would not be subject to preemption. However, if they are derived from a shipper paying Mason and Dixon based on an estimate billed by Mason and Dixon as to all costs of shipment, and the actual charges of the interline carriers were less than those billed the shipper, the items would be overcharges under the statute, preempting the Alabama Act.

### 2. *Customer Credits*

■ The Interstate Commerce Commission has issued several rulings dealing with the problem of duplicate payments. In *Revlon, Inc. v. Baltimore & Ohio Railroad,* ICC Docket No. 35319 (Feb. 16, 1971), the Commission found that duplicate payments were "just as much an overcharge as any payment which results in the carrier's receiving more than the applicable charges." As noted by defendant, however, the question in *Revlon* was not whether the statute of limitations' bar for "overcharges" also applied to duplicate payments, but rather whether or not the carrier was responsible for refunding duplicate payments in the same manner as "overcharges."

In 1975 the ICC overruled *Revlon* in *Duplicate Payments of Freight Charges,* 350 I.C.C. 513 (Aug. 4, 1975). The Commission in the 1975 case, unlike *Revlon,* was presented squarely with the question whether duplicate payments, defined as "two or more payments each for the exact amount of the tariff-published freight charges," were overcharges for purposes of the three-year statute of limitations. The Commission answered in the negative, distinguishing the duplicate payment problem from the intent of Congress when it established the provisions for overcharges. It described this intent as one "to prohibit discrimination in the rates charged or the services offered different shippers." The Commission concluded that the overcharge provisions

> were designed to define and limit disputes regarding the propriety of the charges assessed by carriers, and not to control disputes arising after the proper charges have been assessed and paid. We do not believe that Congress intended a situation such as this where the shipper-carrier dispute bears no relation to the conduct of the parties regarding the performance of transportation service to be subject to our jurisdiction based solely on a broad reading of certain of the Act's technical provisions.

*Id.* at 519. The Commission observed that its ruling precluded future consideration of duplicate payment cases and placed such cases "solely within the jurisdiction of the civil courts, subject to the statute of limitations applicable to the cause of action." *Id.* at 520. In so observing, the Commission stated it did not foresee any adverse effect on the public interest or on its own pursuit of transportation regulation.

The Commission's next statement comes from a series of rulings denoted *Ex parte 342*, decided September 1, 1978, January 10, 1979, and November 7, 1979. These rulings accompany the Commission's promulgation of regulations governing the processing, investigation and disposition of overcharges, duplicate payments, and overcollections. 49 C.F.R. § 1008. Both plaintiff and defendant cite the Court to these rulings to support their respective positions.

Section 1008.2(b) provides that "overcharge" means an overcharge as defined in Section 304a, Title 49, United States Code. It goes further, however, and includes in the definition, duplicate payments. "Duplicate payments" is defined as "two or more payments for transporting the same shipment. Where one or more payments is not in the exact amount of the applicable tariff rates and charges, refunds shall be made on the basis of the excess amount over the applicable tariff charges." *Id.* § 1008.2(c). Plaintiff cites these regulations and a Fifth Circuit opinion in which the court held that a federal agency's regulations have the force and effect of law, *Gulf State Manufacturers Inc. v. NLRB*, 579 F.2d 1298, *reh'g granted*, 587 F.2d 808 (1978), *reh'g*, 598 F.2d 896 (5th Cir.1979), and concludes that "overcharge" encompasses "duplicate payments" for purposes of the three-year statute of limitations. Defendant, however, also cites the Court to the September 1, 1978 *Ex parte 342* ruling in which the Commission stated:

> In concluding to omit duplicate payments from the term overcharge and the act's relevant 3-year statute of limitations, division 2, in *Duplicate Payment of Freight Charges, supra* at 520, emphasized the following:

> We believe our interpretation here is necessary. The carriers and their representatives are reminded that, had they acted to resolve duplicate payment claims promptly and with understanding of the reasons for which they occurred, instead of attempting to retain as a revenue source these monies paid in error and not paid for performance of transportation services, our action herein would not be necessary.

*Ex parte 342*, 358 I.C.C. 114, 138 (Sept. 1, 1978). The Commissioner argues that the Commission thus reaffirmed its earlier position taken in *Duplicate Payment* notwithstanding the inclusion of duplicate payments within the definition of overcharges for purposes of the procedures outlined in the regulations.

A careful reading of the regulations promulgated by the Commission reveals that they are procedures to be employed by motor carriers when confronted by "written claims" for overcharges, duplicate payments, and overcollection. The regulations do not concern civil actions brought against a common carrier. Nowhere in the regulations is the three-year statute of limitations mentioned. Indeed, the regulations provide for time limits in which the carrier must respond to written claims, 49 C.F.R. § 1008.8, and state that when "no refund is made by the carrier, the carrier shall advise the payor of its right to *file a formal claim* for refund with the carrier in accordance with the regular claims procedure under this part." 49 C.F.R. § 1008.9. (emphasis added). What is also persuasive to the Court is the terminology employed by the Commission in its definition of "duplicate payments." Section 1008.2(c), Title 49, Code of Federal Regulations provides: "Where one or more payment is not in the exact amount of the applicable tariff rates and charges, refunds shall be made on the basis of the excess amount over the applicable tariff rates and charges." This provision indicates that the inclusion of duplicate payments within the definition of "overcharge" was limited to when the original or the duplicate payment was in excess of the

applicable tariff rate, thus an overcharge, and not when the correct tariff was applied.

This interpretation is reinforced by the absence of any provisions for duplicate payments in the enactment of the Revised Interstate Commerce Act. Section 11705(b)(1), Title 49, United States Code, was enacted on October 17, 1978, only one month after the Commission's first *Ex parte 342* ruling, and makes a common carrier liable in a civil court "for amounts charged that exceed the applicable rate for transportation or service contained in a tariff..." As noted by the Commission in *Duplicate Payments,* this terminology refers to disputes concerning the propriety of charges assessed on a bill in relation to the transportation performed. Had Congress intended to include duplicate payments within the meaning of overcharges for purposes of the three-year statute of limitations, it could have easily done so.

The Court concludes that for purposes of civil actions brought against a common carrier to recover duplicate payments the three-year statute of limitations does not apply and that therefore, there is no preemption here and the applicable state statute of limitations applies. Having found no preemption as to duplicate payments, and preemption as to only one form of interline credits, the Court must now determine whether or not the items defendant is claiming fall within Alabama's UDUPA.

B. *The Alabama Act*

■ That portion of Alabama's UDUPA on which the Commissioner is relying is Section 35–12–29, Alabama Code. This section is the catchall in the Act that presumes abandoned miscellaneous personal property not otherwise covered specifically. It provides:

All tangible and intangible personal property, not otherwise covered by this article, including, but not limited to and by way of illustration, money, stocks, bonds, certificates of membership in corporations, income, amounts due and payable under the terms of insurance policies not covered by section 35–12–23, pension

trust agreements, profit-sharing plans, security deposits, refunds, funds deposited to redeem stocks, bonds, coupons and other securities, or to make a distribution thereof, together with any income, interest or increment thereon and deducting any lawful charges, that is held or owing in this state in the ordinary course of the holder's business and has remained unclaimed by the owner for more than seven years after it became payable or distributable is presumed abandoned; provided, that unclaimed or unpaid wages and salaries which have remained unclaimed by the owner for more than one year after becoming payable are presumed abandoned.

As is evidenced from the above, the statute has at least two requirements before it applies. First, the property must be owed in the ordinary course of the holder's business. Second, the property must be owed to a person or entity in Alabama.

■ Plaintiff's post-trial brief, filed October 25, 1982, cites the cases of *Allstate Insurance Co. v. Eagerton,* 403 So.2d 172 (Ala.1981) and *Aetna Casualty & Surety Insurance Co. v. State of Alabama, ex rel. Eagerton,* 414 So.2d 455 (Ala.1982) for the propositions that the Act applies only to liquidated and uncontested money and that the Act requires proof from defendant that the Alabama owner is unqualifiedly entitled to the property in question. Both of these cases cite and quote with approval a Pennsylvania court's decision of *Kane v. Insurance Company of North America,* 38 Pa. Cmwlth. 42, 392 A.2d 325 (1978). *Kane* did in fact require the state to prove that the persons were "unqualifiedly entitled" to property under its escheat statute which Justice Shores in *Allstate* observed was not materially different from Alabama's. Both *Allstate* and *Aetna* were cases involving payments under insurance policies, and thus substantially different from the situation here. However, the general tenor of these two decisions does seem to suggest that the Act requires proof that an Alabama resident is unqualifiedly entitled to the property which defendant contends is unclaimed and subject to Alabama's UDUPA.

The Court finds that the items in this case, both customer and interline credits, are not unqualifiedly due anyone, nor do they represent moneys necessarily due and owing to residents of Alabama. Therefore, the amounts thereof do not represent abandoned or unclaimed property to which defendant is entitled under the Alabama Uniform Disposition of Unclaimed Property Act. Because of this conclusion the Court need not address the other issues raised in plaintiff's brief.

A judgment will be entered in accordance with this opinion.

### JUDGMENT

In accordance with the memorandum opinion entered this date, it is

ORDERED, ADJUDGED and DECREED that judgment be and is hereby entered declaring that the items listed in plaintiff's Exhibit 9 are not monies or other property held by The Mason and Dixon Lines, Incorporated which are subject to the claims of and collection by defendant under the Alabama Uniform Disposition of Unclaimed Property Act.

It is further ORDERED, ADJUDGED and DECREED that defendant Ralph P. Eagerton, Jr., Commissioner of the Alabama State Department of Revenue, and his successor in office, or through his agents, servants, officers, or employees, are enjoined from seeking to collect from plaintiff under the Alabama Uniform Disposition of Unclaimed Property Act the monies made the subject of this action.

It is further ORDERED, ADJUDGED and DECREED that defendant is denied the relief he seeks in his counterclaim.

It is further ORDERED that the court costs incurred in this proceeding are taxed against defendant, for which execution may issue.